# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

INSECO, INC., a Florida corp.
    Plaintiff,

v.                            CASE NO. 8:23-cv-1996-TPB-TGW

THE PAVER STORE, LLC, etc.
and SCOTT BRIAN COLLETTI, etc.
    Defendants.

_____/

## REPORT AND RECOMMENDATION

The plaintiff alleges that the defendants infringed on its "SEAL RX" trademark by selling counterfeit SEAL RX building sealant products. The defendants failed to defend this case, and defaults were entered against them. The plaintiff has filed an Amended Motion for Final Default Judgment (Doc. 42) seeking money damages, attorneys fees' and costs, and entry of a permanent injunction.

The well-pled complaint allegations and evidence establish the defendants' liability and that a permanent injunction is warranted. I recommend that judgment be entered for the plaintiff and against the defendants, joint and severally, in the amount of $300,000, and an award of the plaintiff's reasonable attorneys' fees and costs to be determined upon the filing of an appropriate motion. I further recommend that the preliminary

injunction entered in this case be made permanent.

I.

A. Plaintiff Inseco develops, manufactures, and sells sealants to protect building products such as wood, brick, paver, concrete and natural stone (Doc. 1, p. 3).[1] Michael Doikos, president of Inseco, states that he has "dedicated … twenty-seven … years … to building the Inseco brand and providing customers with the highest … sealers in the industry" (Doc. 42-1, p. 2).

Defendant Scott Brian Colletti is a Florida resident who formed the defendant company, The Paver Sealer Store, which sells building sealant products through its website, www.paversealerstore.com. (Doc. 1, p. 2). Colletti allegedly directs and controls the acts of The Paver Sealer Store (id., p. 9, ¶20).

Inseco promotes its products and services under many registered trademarks, including "SEALRX" and "PAVER SEAL RX" (see Doc. 1-1, Ex. A). The "SEAL RX" is a distinct and bold mark with an "X" on the bottom of the "R," similar to a medical prescription symbol, and contains a leaf in the center of the "R" (see id., p. 5).

Inseco has expended considerable resources developing,

---

[1] Pagination refers to the page numbers assigned by CM/ECF.

2

manufacturing, packaging, and marketing its products (Doc. 1, p. 9). Inseco sells goods to stores such as Sherwin Williams and Home Depot, and at retail directly to contractors.

Inseco's distinct style of packaging makes it easy for consumers to distinguish Inseco products from other sealants (Doc. 42-1, p. 2). Due to its efforts, Inseco has an excellent reputation; the consuming public associates Inseco marks with high quality products (id., p. 3; see, e.g., Doc. 2-1, p. 1).

In May 2021, The Paver Sealer Store approached Inseco about working with Inseco as a reseller and representative of Inseco products. Inseco agreed (Doc. 1, p. 9, ¶21).[2]  In June 2021, the defendants began reselling the plaintiff's trademarked products at www.paversealerstore.com (id., p. 10, ¶22). Additionally, The Paver Sealer Store served as a sales representative for Inseco. Over a two-year period, the defendants purchased from the plaintiff approximately $490,000 in Inseco products for resale and received over $55,000 in commissions (id., p. 11, ¶30).

However, in April 2023, the defendants accused Inseco of double billing, over-charging, and charging for unshipped orders. The defendants disputed over $142,000 in Inseco charges (id., ¶31; Doc. 42-1, p.

---

[2] There is no written contract governing the parties' business relationship.

3

7, ¶9).  As a result, the parties' business relationship ended and Inseco

stopped selling its products to the defendants in May 2023 (Doc. 1, p. 12,

¶¶35, 36; Doc. 42-1, p. 4, ¶10).[3]

      Nonetheless, the defendants continued to advertise and sell on

www.paversealerstore.com what appeared to be genuine Inseco products

(see, e.g., Doc. 2-1, p. 4; compare Doc. 1-5, pp. 5-6 with Doc. 1-3, pp. 6-8).

Doikos states that the defendants' continued sale of Inseco products struck

him as odd because The Paver Sealer Store's inventory of Inseco goods was

limited, and they were no longer able to obtain Inseco products without

purchasing them through Inseco (Doc. 42-1, p. 4, ¶12).  In May 2023, Doikos

discovered that the defendants were selling counterfeit SEAL RX products.

Specifically, the defendants were placing Inseco labels on containers and

offering them for sale as genuine Inseco products (see id.).

      For instance, Larry Harris, a long-time Inseco customer, bought

from  www.paversealerstore.com what he believed was Inseco's SEAL RX

sealant (Doc. 2-1, pp. 7-8).  However, the product Harris received "was in

packaging different from what INSECO's packaging usually looks like" (id.,

p. 4, ¶8;  compare id., p. 3 with id., p. 4).  Thus, the product featured the

---

[3] The dispute regarding the alleged fraudulent credit card charges and accusations are the
subject of a lawsuit filed by the plaintiff in state court in June 2023 (see Doc. 1-2).

SEAL RX trademark on the label, but the packaging was otherwise different (Doc. 2-1, p. 4, ¶8).

Harris contacted Doikos and sent him a photograph of the product (id., p. 5). Doikos states (id., pp. 4-5, ¶13):

> [I]t was clearly not one of my products. The product Mr. Harris received was in a package different from the packaging that Inseco's SEAL RX product is sold in .... Because of the stark differences between the two packages, I knew that the goods being sold by Defendants did not originate with Inseco, and must be counterfeits.

Additionally, on May 20, 2023, Madeline Boos purchased from www.paversealerstore.com what was advertised as SEAL RX (Doc. 2-2, p. 2, pp. 10-12). She states that the SEAL RX product advertised on The Paver Seal Store website looked identical to the SEAL RX product she was familiar with, but the "the SEAL RX product [she received] from The Paver Sealer Store ... [was] package[d] very different from what ... I know the genuine SEAL RX product to look like" (id., p. 5, ¶6; compare id., p. 4 with id., p. 5)

Boos also contacted Doikos to ask if this product was an authentic SEAL RX product, and Doikos told her that it was not (id., p. 5, ¶7). Moreover, Doikos states that he has received complaints from many other customers who purchased from paversealerstore.com what they believed were Inseco goods but received counterfeit products (Doc. 42-1, p.

5

5, ¶14).[4]

Doikos emphasizes that these products do not originate from, nor are they affiliated with Inseco, and Inseco does not know what the defendants are putting in those containers (Doc. 1, p. 14, ¶¶39-44). Furthermore, because of its broad customer base, Inseco is unable to inform all its customers that the SEAL RX product being sold by the defendants is counterfeit (Doc. 42-1, pp. 5-6, ¶15). Consequently, the plaintiff argues, the reputation and goodwill associated with its marks is being diluted. Inseco states that it is also losing revenue because these customers are not purchasing genuine Inseco goods directly through Inseco or one of its authorized distributors (id., p. 6, ¶19).

B. On September 5, 2023, the plaintiff commenced this lawsuit alleging that the defendants infringed on its trademarks and created counterfeit Inseco products in violation of 15 U.S.C. 1114 of the Lanham Act; falsely designated the origin of their products, in violation of 15 U.S.C. 1125(a) of the Lanham Act; and engaged in unfair competition in violation

---

[4] Doikos avers further that, during the week of April 22, 2024, "another one of [his] customers placed an order with Defendants via the Paver Sealer Website for two products labeled with Inseco Marks" (Doc. 42-1, p. 6, ¶18). The two products were paid for, and shipping was confirmed (id.). Although the plaintiff did not confirm they received counterfeited goods, the defendants had already been enjoined from selling the plaintiff's products (see Doc. 40, ¶1).

of Florida common law (Doc. 1).

The summons and complaint were served upon the defendants (see Docs. 12, 13). When the defendants failed to timely answer or otherwise respond to the complaint, the plaintiff filed a Motion for Clerk's Entry of Default against both defendants, which was granted (Docs. 21, 22).

However, in December 2023, Colletti filed a belated answer and United States District Judge Tom Barber held a case management conference to discuss the litigation (Doc. 29). Judge Barber scheduled a second case management conference for March 2024 (Doc. 30) but Colletti's attorney withdrew from the case before that conference (see Docs. 31, 32).

Consequently, Judge Barber ordered Colletti to appear in-person at the second case management conference, cautioning Colletti that, if he failed to appear, it would "result in the Court allowing the Clerk's default ... to stand and striking the answer .... This means that Defendant Colletti will not be permitted to present a defense in this case, having admitted to the allegations of the complaint" (Doc. 33). Nonetheless, Colletti did not appear at that case management conference (see Doc. 35). Accordingly, the Clerk's Default was not vacated.

Furthermore, on April 17, 2024, Judge Barber entered a preliminary injunction enjoining the defendants from, among other things,

7

"[m]anufacturing or causing to be manufactured, importing, advertising, promoting, distributing, selling or offering to sell" products with the Inseco marks identified in the complaint (Doc. 40).

Thereafter, the plaintiff filed an Amended Motion for Final Default Judgment and Permanent Injunction Against All Defendants (Doc. 42).[5]    The claims are supported by the verified complaint (Doc. 1), declarations of the plaintiff's president and two customers (Docs. 2-1, 2-2, 42-1), and exhibits showing the packaging of the authentic SEAL RX product and the defendants' counterfeit SEAL RX product (Docs. 1-3, 2-1, 2-2).  The motion was referred to me.

The plaintiff requests (1) a default judgment in its favor and against the defendants with an award of statutory damages of at least $900,000; (2) an award of attorneys' fees and costs; and (3) the entry of a permanent injunction prohibiting the defendants from, among other things, further acts of infringement, counterfeiting, and unfair competition; and (4) the destruction of infringing goods (Doc. 42, pp. 24-25).

II.

The Eleventh Circuit discussed the standards governing entry

---

[5]The initial Motion for Default Judgment pertained only to the corporate defendant.  The plaintiff amended the motion to include both defendants (Doc. 42, p. 3).

of default judgment in <u>Surtain</u> v. <u>Hamlin Terrace Foundation</u>, 789 F.3d 1239,

1244–45 (11th Cir. 2015):

> When a defendant has failed to plead or defend, a district court may enter judgment by default. Fed.R.Civ.P. 55(b)(2). Because of our "strong policy of determining cases on their merits," however, default judgments are generally disfavored. <u>In re Worldwide Web Sys., Inc.</u>, 328 F.3d 1291, 1295 (11th Cir. 2003). "[W]hile a defaulted defendant is deemed to admit the plaintiff's well-pleaded allegations of fact, he is not held to admit facts that are not well-pleaded or to admit conclusions of law." <u>Cotton</u> v. <u>Mass. Mut. Life Ins. Co.</u>, 402 F.3d 1267, 1278 (11th Cir.2005) .... Entry of default judgment is only warranted when there is "a sufficient basis in the pleadings for the judgment entered." <u>Nishimatsu Constr. Co.</u> v. <u>Houston Nat'l Bank</u>, 515 F.2d 1200, 1206 (5th Cir. 1975).
>
> ... [W]e have ... interpreted the standard as being akin to that necessary to survive a motion to dismiss for failure to state a claim. <u>See</u> <u>Chudasama</u> v. <u>Mazda Motor Corp.</u>, 123 F.3d 1353, 1370 n. 41 (11th Cir. 1997) ("[A] default judgment cannot stand on a complaint that fails to state a claim.")
>
> ....
>
> When evaluating a motion to dismiss, a court looks to see whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft</u> v. <u>Iqbal</u>, 556 U.S. 662, 678 ... (2009) (<u>quoting</u> <u>Bell Atlantic Corp.</u> v. <u>Twombly</u>, 550 U.S. 544, 570 ... (2007)). This plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

9

defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556 …).

Furthermore, "[w]hen entry of default is sought against a party who has failed to plead or otherwise defend, the district court has an affirmative duty to look into its jurisdiction both over the subject matter and the parties." System Pipe & Supply, Inc. v. M/V VIKTOR KURNATOVSKIY, 242 F.3d 322, 324 (5th Cir. 2001).

Initially, I note that the defendants had ample opportunity to defend themselves in this lawsuit, as Judge Barber held two case management conferences to facilitate this litigation even after the defendants defaulted.

Furthermore, the jurisdictional allegations in the complaint show the court has subject matter and personal jurisdiction over both defendants. Specifically, Colletti resides in Hillsborough County, Florida, and allegedly directed the infringing conduct (Doc. 1, p. 2, ¶3; id., p. 15, ¶50). The Paver Sealant Store is a Florida corporation with its principal place of business in Florida that advertises, ships and sells infringing products throughout the United States via its website (id., ¶¶ 1-3, 7, 8; Doc. 10-1 at ¶ 5). See Fla. Stat. § 48.193; Williams Elec. Co. v. Honeywell, Inc., 854 F.2d 389, 392 (11th Cir. 1988).

Of course, there is subject matter over the Lanham Act claims,

10

28 U.S.C. 1331, 15 U.S.C. 1121(a). Furthermore, supplemental jurisdiction over the Florida unfair competition claim is appropriate because it relates to the Lanham Act causes of action. 28 U.S.C. § 1367(a).

III.

The plaintiff has established the defendants' liability for trademark infringement and false designation of origin under the Lanham Act and unfair competition based on the unrefuted allegations that the defendants sold counterfeit Inseco SEAL RX products.

A.    <u>Trademark counterfeiting and infringement.</u>

A defendant is liable for trademark infringement under the Lanham Act when, without the consent of the registrant, it uses "in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark which is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. 1114. A counterfeit mark is "a spurious mark which is identical with, or substantially indistinguishable from a registered mark." 15 U.S.C. 1127.

In order to prevail on the claim of trademark infringement, the plaintiff must establish: (1) that it possessed a valid mark, (2) that the defendants used the mark, (3) that the defendants' use of the mark occurred "in commerce," (4) that the defendants used the mark "in connection with

11

the sale ... or advertising of any goods," and (5) that the defendants used the mark in a manner likely to confuse consumers.  <u>North American Medical Corp.</u> v. <u>Axiom Worldwide Inc.</u>, 522 F.3d 1211, 1218 (11th Cir. 2008).

The plaintiff has established that it possesses valid marks by identifying the registration numbers of its marks and providing copies of the marks from the U.S. Patent and Trademark Office's website (<u>see</u> Doc. 1-1, Ex. A).

Furthermore, the defendants unlawfully used the Inseco SEAL RX trademark in commerce by selling counterfeit SEAL RX sealant though The Paver Sealer Store website, <u>www.paversealerstore.com</u> (<u>see</u> Doc. 42-1, p. 4, ¶¶12-14).  Specifically, the defendants placed the SEAL RX trademark on goods that were not manufactured by the plaintiff, nor did the plaintiff authorize the use of its SEAL RX mark in that manner (<u>see</u> <u>id.</u>, Docs. 2-1, 2-2).

The plaintiff, moreover, has shown that the defendants' misuse of the mark is not only likely to, but has in fact, caused confusion among consumers (<u>see</u> <u>id.</u>).

When determining likelihood of confusion, the following factors are considered:

> (1) the strength of the plaintiff's mark; (2) the similarity between the plaintiff's mark and the

12

allegedly infringing mark; (3) the similarity between the products and services offered by the plaintiff and defendant; (4) the similarity of the sales methods; (5) the similarity of advertising methods; (6) the defendant's intent, <u>e.g.</u>, does the defendant hope to gain competitive advantage by associating his product with the plaintiff's established mark; and (7) actual confusion.

<u>Id</u>. at 1220.

The plaintiff easily satisfies each factor. The plaintiff established that the SEAL RX and other trademarks are strong. Thus, it is undisputed that Inseco has expended considerable resources over many years to develop and market its trademarked goods, and that they are recognized as high quality building sealant products by consumers. Indeed, the defendants' efforts to counterfeit the plaintiff's products shows that the defendants also believe the SEAL RX mark is strong.

Furthermore, the similarity between the plaintiff's mark and the allegedly infringing mark is unmistakable, as the counterfeit products are labeled with Inseco's identical trademark (<u>compare</u> Doc. 1-1, pp. 5-7 <u>with</u> Doc. 2-1, p. 4; Doc. 2-2, p. 5).

The sales methods are also the same. Inseco and The Paver Sealer Store sell SEAL RX sealant on the internet. Furthermore, the defendants use on www.paversealerstore.com photographs of genuine SEAL

13

RX products that are identical to those on Inseco's website (see Doc 1-3, pp. 6-8, Doc. 1-5, pp. 6-7). The likelihood of confusion is compounded because The Paver Sealer Store sold genuine Inseco products on www.paversealerstore.com for two years before counterfeiting the SEAL RX mark. Thus, customers had associated the paversealerstore website with genuine Inseco products.

Moreover, the defendants clearly intended to gain a competitive advantage by selling counterfeit SEAL RX sealant. There is no other explanation for the defendants' copying and taping the SEAL RX trademark on products that did not originate with the plaintiff.

Finally, the plaintiff has submitted to the court two documented instances of consumer confusion. Notably, "[a]ctual confusion by a few customers is the best evidence of likelihood of confusion by many customers." Freedom Sav. & Loan Ass'n v. Way, 757 F.2d 1176, 1185 (11th Cir. 1985).

As discussed, SEAL RX customers Larry Harris and Madeline Boos purchased from www.paversealerstore.com what they believed to be genuine SEALRX products (Docs. 2-1, 2-2). However, they were confused when they received products that featured the SEALRX trademark but were otherwise packaged differently (id.). Doikos states those were not genuine

14

SEAL RX products, and adds that he received many other such complaints (Doc. 42-1, p. 5, ¶14).

In sum, the plaintiff's well-pleaded and undisputed factual allegations show that the defendants' unauthorized use of the plaintiff's SEAL RX trademark constitutes trademark and infringement and counterfeiting in violation of the Lanham Act (Count I).

Additionally, I recommend that the defendants be held jointly and severally liable for trademark infringement. In this respect, it is well-established that individuals can be held personally liable for trademark infringement under the Lanham Act. <u>Babbit Elecs. Inc.</u> v. <u>Dynascan Corp.</u>, 38 F.3d 1161, 1184 (11th Cir. 1994). Specifically, "a corporate officer who directs, controls, ratifies, participates in, or is the moving force behind the infringing activity, is personally liable for such infringement without regard to piercing the corporate veil." <u>Id.</u>, <u>see also</u> <u>Chanel, Inc.</u> v. <u>Italian Activewear of Fla., Inc.</u>, 931 F.2d 1472, 1477 (11th Cir. 1991).

The plaintiff alleges that "Colletti is directing and controlling the infringing and counterfeiting acts" (Doc. 1, p. 15, ¶50). The defendants, by virtue of their defaults, admit these allegations are true. <u>See</u> <u>Surtain</u> v. <u>Hamlin Terrace Foundation</u>, <u>supra</u>, 789 F.3d at 1244–45 (11th Cir. 2015) ("[A] defaulted defendant is deemed to admit the plaintiff's well-pleaded

allegations of fact."). This conduct makes Colletti personally liable for trademark infringement. See Babbit Elecs. Inc. v. Dynascan Corp., supra, 38 F.3d at 1184; Chanel, Inc. v. Italian Activewear of Fla., Inc., supra, 931 F.2d at 1477.

        B.      False designation.

The plaintiff also alleges that the defendants falsely marketed their counterfeit product as the plaintiff's SEAL RX sealant. A defendant is liable for false designation of origin under the Lanham Act when it "misrepresents the nature, characteristics, qualities, or geographic origin of its [goods] … in commercial advertising or promotion." 15 U.S.C. 1125(a).

"The factors relevant to establishing [false designation of origin] are identical to the factors relevant to establishing a likelihood of confusion with respect to trademark infringement under 15 U.S.C. § 1114." Ross Bicycles, Inc. v. Cycles USA, Inc., 765 F.2d 1502, 1503–04 (11th Cir. 1985). Thus, the focus is "whether the public is likely to be deceived or confused by the similarity of the marks." See Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 780 (1992).

As discussed above, the defendants intentionally created the false impression that the SEAL RX sealants sold through www.paversealerstore.com were genuine SEAL RX products by advertising

16

genuine Inseco products on their website and placing the plaintiff's SEAL RX trademark on the packaging of the counterfeit sealant. Furthermore, those misrepresentations are likely to, and have caused, confusion among the consuming public. Therefore, the plaintiff has sufficiently pleaded its claim for false designation of origin (Count II).

C. <u>Unfair Competition</u>.

The plaintiff also alleges that the defendants' sale of counterfeited SEAL RX products constitutes unfair competition under Florida common law. The analysis for the unfair competition claim is the same as that for determining trademark infringement. Thus, "[w]hether a defendant's use of a plaintiff's trademarks created a likelihood of confusion between the plaintiff's and the defendant's products is also the determining factor in the analysis of unfair competition under the common law of Florida." <u>Abercrombie & Fitch Trading Co.</u>, <u>supra</u>, 2019 WL 4693557 at *3; <u>see also</u> <u>Babbit Elecs., Inc.</u> v. <u>Dynascan Corp.</u>, <u>supra</u>, 38 F.3d at 1181. Therefore, the finding that the plaintiff has established trademark infringement is also determinative of the merits of the plaintiff's unfair competition claim under Florida law (Count III).

V.

The plaintiff requests under the Lanham Act an award of

17

$900,000 in statutory damages, its attorneys' fees and costs, and the entry of a permanent injunction (Doc. 42, pp. 24-25).

The plaintiff's allegations regarding the amount of damages are not admitted by virtue of default; the court must determine both the amount and character of damages. See Nishimatsu Const. Co. v. Houston National Bank, 515 F.2d 1200, 1206 (5th Cir. 1975). A court may award damages "without holding an evidentiary hearing based upon affidavits and other documentary evidence if the facts are not disputed." Perry Ellis Int'l, Inc. v. URI Corp., No. 06-22020-CIV, 2007 WL 3047143 at *1 (S.D. Fla. Oct. 18, 2007); S.E.C. v. Smyth, 420 F.3d 1225, 1232 n.13 (11th Cir. 2005) (An evidentiary hearing is not mandatory on the issue of damages "where all essential evidence is already of record."). The plaintiff provides sufficient evidence to enable the court to calculate the amount of statutory damages to which it is entitled without a hearing.

A. Statutory damages.

The Lanham Act provides that, when the trademark infringement "involve[s] the use of a counterfeit mark," the plaintiff "may elect ... to recover, instead of actual damages and profits under subsection [15 U.S.C 1117(a)], an award of statutory damages" of "not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services

sold, offered for sale, or distributed, as the court considers just." 15 U.S.C. 1117(c)(1). If the use of the counterfeit mark was willful, then the plaintiff may elect an award of "not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just." 15 U.S.C. 1117(c)(2).

The plaintiff has elected an award of statutory damages. This election is appropriate when, as here, no actual damages are proven, or actual damages and profits are difficult or impossible to calculate. Petmed Express v. MedPets.com, Inc,. 336 F. Supp. 2d 1213, 1219-20 (S.D. Fla. 2004).

The Lanham Act "does not provide guidelines for courts to use in determining an appropriate award." Nike, Inc. v. Austin, No. 6:09-CV-796-ORL28KRS, 2009 WL 3535500 at *4 (M.D. Fla. Oct. 28, 2009) (citation omitted). There is wide discretion to set an amount of damages within the statutory limits "as the court considers just." 15 U.S.C. 1117(c)(1)-(2); see Ramada Inns, Inc. v. Gadsden Motel Co., 804 F.2d 1562, 1564–65 (11th Cir. 1986). For the reasons discussed below, I recommend that the plaintiff be awarded statutory damages of $300,000 for the defendants' counterfeiting of the SEAL RX trademark.

Initially, I note that a damages award for counterfeiting is appropriately limited to the SEAL RX mark because, as the plaintiff

implicitly acknowledges, the defendants' counterfeiting of other Inseco marks is speculation (see Doc. 1, p. 14, ¶43) (emphasis added) ("At the very least, Paver Sealer is using a counterfeit of the SEAL RX mark to sell its Counterfeit Goods."). See Surtain v. Hamlin Terrace Foundation, supra, 789 F.3d at 1245 (citation omitted) ("[W]hile a defaulted defendant is deemed to admit the plaintiff's well-pleaded allegations of fact, he is not held to admit facts that are not well-pleaded or to admit conclusions of law."). Furthermore, there is no allegation in the complaint that the defendants were prohibited from selling genuine Inseco products prior to the Court's entry of the Preliminary Injunction in April 2024.

There is, unsurprisingly, a wide range of statutory damages awards for counterfeiting products. See Luxottica Grp., S.p.A. v. Casa Los Martinez Corp., No. 1:14-CV-22859-JAL, 2015 WL 13776171 at *5 (S.D. Fla. Jan. 30, 2015) (listing cases with statutory damages ranging from $100,000 to $400,000 per infringed trademark).

Under the totality of these circumstances, I recommend a statutory damages award of $300,000, imposed against the defendants jointly and severally. This is a generous award considering that significantly lower amounts have been awarded for counterfeiting more well-known trademarks. See id.

There are several factors supporting this award, including that the defendants have not defended this case or otherwise challenged monetary damages. The plaintiff is losing an unknown amount of profits when customers purchase counterfeit SEAL RX products from the defendants instead of obtaining the genuine product through Inseco or one of its authorized distributors (Doc. 42-1, p. 6, ¶19). Concomitantly, the defendants benefit directly from the plaintiff's expenditures of resources and time in building the SEAL RX trademark and the associated goodwill.

Furthermore, the consuming public is being harmed because customers who want to purchase genuine SEAL RX sealant are unwittingly receiving counterfeit SEAL RX sealant (id.). Additionally, because the origin and quality of the counterfeit SEAL RX product is unknown, Inseco's reputation and goodwill are threatened (id., p. 3, ¶4).

Moreover, the defendants' infringement of the SEAL RX mark was blatant and willful. See St. Luke's Cataract & Laser Institute, P.A. v. Sanderson, 573 F.3d 1186, 1205 (11th Cir. 2009) (A purpose of statutory damages is to sanction or punish defendants to deter future wrongful conduct.). As discussed, the defendants sold customers a counterfeit sealant product that prominently featured the SEAL RX trademark that they photocopied and taped to the containers. These actions are unquestionably

21

willful.  See Optimum Techs., Inc. v. Home Depot U.S.A., Inc., 217 Fed. Appx. 899, 903 (11th Cir. 2007) (citation omitted) (A willful violation of a trademark occurs when the infringer "knowingly and deliberately cash[es] in upon the good will of [the infringed company]."); Abercrombie & Fitch Trading Co. v. Importrade USA, Inc., 2009 WL 10668408 at *2 (S.D. Fla. Aug. 18, 2009) (citation omitted) (willful conduct means a "deliberate and unnecessary duplicating of a plaintiff's mark ... in a way that was calculated to appropriate or otherwise benefit from the good will the plaintiff had nurtured").

Underscoring the willfulness of the infringement is the defendants' flouting of the Preliminary Injunction.  See PetMedExpress, Inc. v. MedPets.com. Inc., supra, 336 F. Supp. 2d at 1220 (The defendant's continued use of the marks after receiving notice of the infringement buttresses a finding of willfulness.).   Thus, the plaintiff presented evidence that the defendants continued to offer purportedly genuine Inseco products on www.paversealerstore.com after the entry of the Preliminary Injunction which enjoined them from doing so (see Doc. 2-1, p. 3; Doc. 2-2, p. 1; Doc. 42-1, p. 6).  Specifically, the injunction was entered on April 17, 2024, and the plaintiff presented evidence that the defendants continued to sell counterfeit Inseco products into May 2024, in violation of the Preliminary

Injunction (Doc. 40).

I note that the plaintiff has requested an extraordinary award "of at least $900,000 in statutory damages" (Doc. 42, p. 20) (emphasis in original). This request is baseless.

The plaintiff states that it

> believes this is a fair award, given that, had Defendants continued to work with Inseco through today, instead of engaging in their unlawful activities, Inseco estimates (based on the two prior years' sales …) it would have made at least $250,000 in sales to Defendants, and estimates it would have received at least another $50,000 in sales to customers brought to Inseco by Defendants …. Thus, Inseco believes that tripling the $300,000 it would likely have received in sales over the past year but for Defendants' actions is a fair way to determine the amount of statutory damages it should be awarded.[6]

(id.) (emphasis added).

This reasoning is fatally flawed because there is no basis for finding that the plaintiff would have made any sales to the defendants over the past year. Thus, the plaintiff states that their business relationship was irretrievably broken in May 2023, when the defendants accused the plaintiff of overbilling (see Doc. 1, p. 12, ¶36; Doc. 42, p. 4; Doc. 42-1, p. 4, ¶10).

---

[6] Treble actual damages are available under §1117(b).

At that point, the plaintiff stopped selling Inseco products to the plaintiff. Therefore, an award of statutory damages based on a loss of future sales is groundless.

In sum, I recommend that the plaintiff be awarded statutory damages of $300,000 under the Lanham Act for the defendants' willful counterfeiting of the plaintiff's SEAL RX trademarked sealant.

### B. Attorneys' Fees.

The plaintiff also seeks an award of its attorneys' fees and costs (Doc. 42, p. 24). The Lanham Act specifies that the plaintiff is entitled to its costs, and the court has discretion to award the plaintiff its attorneys' fees "in exceptional cases." 15 U.S.C. 1117(a). An exceptional case is one that "stands out from others based on the strength of the litigating positions or in the manner in which the case was litigated." Tobinick v. Novella, 884 F.3d 1110, 1118 (11th Cir. 2018). This standard is less strict than the "malicious, fraudulent, deliberate, and willful" standard previously articulated by the Eleventh Circuit. See Id. at 1117.

The strength of the counterfeiting evidence, the defendants' failure to defend themselves in this litigation, and their defiance of the Preliminary Injunction warrant a finding that this is an exceptional case entitling the plaintiff to an award of its reasonable attorneys' fees.

Accordingly, I recommend an award of its reasonable attorneys' fees and costs upon the filing of an appropriate motion.[7]

C. Permanent Injunction.

Finally, the plaintiff requests the entry of a permanent injunction that enjoins the defendants from, among other things, using any mark or design similar to the Inseco marks in connection with the sale of unauthorized goods; or advertising the defendants' goods as being sponsored by, or authorized, endorsed or in any way associated with the plaintiff (Doc. 1, pp. 20-21).

A district court is authorized under the Lanham Act to issue an injunction "according to the principles of equity and upon such terms as the court may deem reasonable" to prevent violations of trademark law. 15 U.S.C. 1116(a).  Injunctive relief is available in a default judgment setting. See, e.g., PetMedExpress, Inc. v. MedPets.com. Inc., supra, 336 F. Supp. 2d at 1222–23.

---

[7] The plaintiff is advised that the Local Rules set forth a detailed bifurcated procedure under which the plaintiff has "forty-five days after the order determining entitlement ... [to] file a supplemental motion supporting the requested amount with respect to both hourly rates and the time expended." Local Rule 7.01(c)(1)-(5).  Furthermore, the plaintiff is advised that, although the defendants have defaulted, the court must ensure that the amount awarded is reasonable. Am. Civil Liberties Union of Georgia v. Barnes, 168 F.3d 423, 428 (11th Cir. 1999).  Therefore, fee applicants are required to exercise "billing judgment," and eliminate "excessive, redundant, or otherwise unnecessary hours." Id. (citation omitted).

To obtain permanent injunctive relief, the plaintiff must demonstrate that: "(1) it has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction." Angel Flight of Ga., Inc. v. Angel Flight of America, Inc., 522 F.3d 1200, 1208 (11th Cir. 2008).

The plaintiff has satisfied the requirements to obtain a permanent injunction. Significantly, there is a rebuttable presumption of irreparable harm for violating the Lanham Act. 15 U.S.C. 1116(a). Furthermore, the plaintiff has shown that it has suffered and will continue to suffer irreparable injury absent an injunction. Without an injunction, the defendants will continue selling the infringing goods and diluting the plaintiff's goodwill because the goods the defendants are representing as the plaintiff's products are of unknown origin and quality. See Ferrellgas Partners, L.P. v. Barrow, 143 Fed. Appx. 180, 190-91 (11th Cir. 2005) (citation omitted) ("The most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendants' goods. Even if the infringer's products are of high quality, the plaintiff can properly insist that its reputation should not be

26

imperiled by the acts of another.").

Additionally, this prohibition will not create a hardship for the defendants because they have no right to use the plaintiff's marks. Of course, since the defendants have not participated in the litigation, the defendants have not presented any hardship for the court's consideration.

Finally, the issuance of a permanent injunction will serve the public interest because it will prevent consumers from being misled by the defendants' counterfeit products. See Angel Flight of Ga., Inc., v. Angel Flight of America, Inc., supra, 522 F.3d at 1209 (The public interest relevant to the issuance of a permanent injunction is the public's interest in avoiding unnecessary confusion.); Nike, Inc. v. Leslie, No. 85-cv-960-T-15, 1985 WL 5251 at *1 (M.D. Fla. June 24, 1985) ("[A]n injunction to enjoin infringing behavior serves the public interest in protecting consumers from such behavior."). For this reason, I recommend that the plaintiff's request for the entry of an injunction against the defendants be granted.

The plaintiff did not include with this motion a proposed permanent injunction. Therefore, I recommend that the plaintiff submit a proposed permanent injunction, or that the court make permanent the preliminary injunction already entered in this case (Doc. 40).[8]

---

[8] The plaintiff requested that the injunction contain a provision precluding the defendants

VI.

For the foregoing reasons, I recommend that default judgment be entered against the defendants on the three counts of the plaintiff's complaint; the plaintiff be awarded statutory damages of $300,000, to be imposed jointly and severally against the defendants; an award of its attorneys' fees with the amount to be determined upon the filing of an appropriate motion; and the entry of a permanent injunction.

Respectfully submitted,

_____
THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE

DATED:  August 27, 2024.

## NOTICE TO PARTIES

The parties have fourteen days from the date they are served a copy of this report to file written objections to this report's proposed findings and recommendations or to seek an extension of the fourteen-day deadline to file written objections.   28 U.S.C.  636(b)(1)(C).   Under 28 U.S.C. 636(b)(1), a party's failure to object to this report's proposed findings and recommendations waives that party's right to challenge on appeal the district court's order adopting this report's unobjected-to factual findings and legal conclusions.

---

from transferring assets out of the defendants' financial accounts and order that all such assets up to the amount of the judgment be transferred to the plaintiff (Doc. 42, p. 24). The plaintiff failed to present legal authority showing this relief is appropriate under the circumstances of this case (id.).  See Local Rule 3.01(a).